No. 37,422 and 37,007

In the Matter of the Estate of Ralph Ellis, Deceased; THE BOARD OF REGENTS OF THE STATE OF KANSAS, STATE OF KANSAS and UNIVERSITY OF KANSAS, Proponents, *Appellants and Cross-appellees,* v. IRENE S. ELLIS, Respondent, *Appellee and Cross-appellant;* THE LAWRENCE NATIONAL BANK OF LAWRENCE, KAN., *Intervener and Appellee.*

(210 P. 2d 417)

Opinion filed October 8, 1949.

*George K. Melvin,* of Lawrence, argued the cause, and *Harold R. Fatzer,* attorney general, *L. P. Brooks,* assistant attorney general, and *A. B. Mitchell,* of Topeka, were with him on the briefs for the proponents, appellants and cross-appellees.

*Edward B. Kelly,* of Oakland, Cal., argued the cause, and *Robert Stone,* of Topeka, and *John W. Brand* and *R. B. Stevens,* both of Lawrence, were with him on the briefs for the respondent, appellee and cross-appellant.

The opinion of the court was delivered by

THIELE, J.: This appeal arises from a proceeding originally started on February 14, 1946, by the filing of a petition in the probate court by the attorney general on behalf of the state of Kansas for the probate of a document bearing the title "Agreement and Testamentary Disposition" and made under date of May 3, 1945, and later set forth herein. For present purposes it may be said the contractural features were between the board of regents of the state of Kansas, hereafter referred to generally as the proponent, and one Ralph Ellis, and the testamentary disposition was by Ralph Ellis, who died December 17, 1945. An answer containing defenses and objections was filed by Irene S. Ellis, the widow of Ralph Ellis, who is hereafter referred to generally as the respondent or as the widow, and a hearing was had which resulted in a judgment that the instrument should not be admitted to probate as a testamentary disposition and that as a contract to make a testamentary disposition it was void and unenforceable. From the above judgment the proponent appealed to the district court, where it filed a reply to the respondent's answer alleging the widow had consented to the agree-

ment, as shown by her written consent a copy of which was attached to the petition, and which is hereafter set out in full. Other allegations are not here noted. Thereafter the respondent widow filed an answer in the district court alleging, in substance, that Ralph Ellis was incompetent to make the will or contract; that he acted under duress of the University of Kansas exercised through its board of regents and certain officers and employees of the beneficiary; that at the time of execution a confidential relation existed and that Ralph Ellis did not know and understand the contents of the document executed by him and did not have independent advice with respect to it; that the document signed by the respondent widow was, for reasons set forth, not freely and understandingly made by her; that the document purporting to be a will was not signed at the end thereof as provided by law, and was not witnessed by two or more competent witnesses as provided by law, and that the witnesses who did sign were incompetent. Other allegations will be noted later if necessary. We need not notice an intervention by the Lawrence National Bank, nor an application made by the respondent asking the trial court to indulge certain presumptions under rule 52 of the rules of this court. During the course of the trial upon the issues joined the court sustained the respondent's demurrer to the proponent's evidence for the probate of the document as a will and the proponent perfected its appeal to this court. The trial proceeded to a conclusion and thereafter the trial court filed its conclusions of fact and of law. The findings go into great detail, cover many matters not of present importance and will not be set forth. Reference is hereafter made to them where necessary. For present purposes it may be said the trial court concluded the contractual features of the agreement were enforceable, but that the respondent widow was not bound by her consent. The motions for a new trial of both the proponent and the respondent were denied with slight exceptions hereafter noted, and each perfected appeals to this court, where the rulings and judgments complained of by the proponent are the order sustaining a demurrer to its evidence that the document was a will, that the consent of the respondent widow was invalid, and the ruling on its motion for a new trial. The rulings and judgment complained of by the respondent widow are that part of the trial court's judgment holding the agreement constituted a valid contract to make a will, that the court erred in rulings made on her challenge of the conclusions of

fact and law, in modifying a conclusion of law respecting the extent of her interest, in admitting the agreement to probate and in the ruling on her motion for a new trial.

It may here be said that the parties to the appeal have filed a joint abstract of over 300 pages, the proponent has filed a brief of forty pages and the respondent two briefs of 275 pages, in which the evidence is set forth at great length, and the various contentions of the parties treated in great detail, with a multitude of decisions and authorities cited in support thereof. These have all been considered but, in the very nature of the case, not all can be separately noted and commented upon. Decision upon certain features likewise eliminates necessity for discussion of others.

The "Agreement and Testamentary Disposition" which gives rise to the controversy is as follows:

"WHEREAS, Mr. Ralph Ellis is the owner and possessor of a Natural History library, consisting of a reasonably large number of volumes on the subject, and

"WHEREAS, Mr. Ralph Ellis desires to locate and deposit said library with the University of Kansas, located in Lawrence, Kansas, because of his special interest in the Museum of Natural History of the University of Kansas, which is now directed by Dr. E. R. Hall, and

"WHEREAS, the University of Kansas, by the Board of Regents of the State of Kansas, and Chancellor Deane W. Malott of the University, has expressed the desire to receive and house said library.

"THEREFORE IT IS AGREED between Mr. Ralph Ellis hereinafter referred to as party of the first part, and the University of Kansas, acting by the Board of Regents of the State of Kansas, and Chancellor Deane W. Malott, hereinafter referred to as party of the second part, as follows:

"Party of the first part agrees:

"First, that as evidence of his good will and good faith in the matter and indicating his genuine interest in the University of Kansas in general and its museum of Natural History in particular, he hereby gives, bargains, sells, and conveys to the University of Kansas for its Museum of Natural History his collection of tanned skins and mammal skins with their complementary skulls, skeletons, and zinc cases.

"Secondly, to deposit with the University of Kansas his library of Natural History and to leave the same on deposit with the University for a minimum interim period of three years from the date hereof, subject to the conditions hereinafter set forth.

"Thirdly, that the State of Kansas, the University of Kansas, and the Board of Regents shall not be liable for any losses occurring to said library.

"Party of the second part agrees:

"First, to accept the books for deposit and to house the same in suitably prepared quarters, but it is understood that the University shall not be required to house the books in air-conditioned rooms.

"Secondly, to furnish heat, light, janitor service and general maintenance of quarters in which said library is housed.

"Thirdly, ever to use said library as a part of the teaching and research equipment of the University of Kansas located at Lawrence, Kansas.

"It is further understood between the parties hereto as follows:

"(a) Consistent with the statement above made that said library is to consist of 'a reasonably large number of books on Natural History' said library is not to be considered as a fixed number of books but rather as a flexible, changeable library, or living organism. Mr. Ralph Ellis, as the builder and owner of said library, desires to continue the development and improvement of said library, and to give effect to his purposes, may loan, sell, or otherwise dispose of portions of said library, and make changes by making new additions or substitutions with utmost freedom. And nothing in this agreement shall preclude Mr. Ralph Ellis from making such changes, sales, substitutions, additions or deletions.

"(b) In making changes in said library, Mr. Ralph Ellis shall be free to dispose of any of the books in the open market without first making any offer to dispose of the same to the University of Kansas or any of its departments, and the failure to offer said books to the University of Kansas shall not be deemed to indicate a lack of a coöperative spirit on Mr. Ralph Ellis' part.

"(c) In view of the special nature of the library in question, use of the items therein shall be subject to the control and permission of either Mr. Ralph Ellis or the Director of the Museum of Natural History at the University of Kansas.

"(d) As a modification of the three-year minimum period mentioned above, Mr. Ralph Ellis may withdraw substantial parts or even all of said library prior to the expiration of the three-year period, but in that event, Mr. Ralph Ellis engaged to reimburse the University of Kansas for any and all expenses incidental to the University's undertaking in connection herewith.

"(e) Mr. Ralph Ellis is to have perfect freedom about keeping the books insured at his expense and with any type of floater policy, in his discretion.

"(f) At the termination of the three-year interim period, it shall be proper for the parties hereto to enter into a new agreement, but in default of such new agreement, and the books remaining on deposit with the University of Kansas pursuant to the terms of this agreement, the provisions of this contract shall continue to determine the rights of the parties with full force and effect for such periods of time as the books remain on deposit with and under the care of the University of Kansas and the Board of Regents of the State of Kansas.

"(g) For the period covered by this agreement, the title and all property rights in and to said library, save as modified by this agreement, shall remain with Mr. Ralph Ellis during his lifetime.

"In the event of the death of Mr. Ralph Ellis while said library is housed with the University of Kansas, either during the three-year interim period or thereafter, then the ownership of said books shall pass absolutely to the University of Kansas, and the Board of Regents of the State of Kansas for the use of the University of Kansas. It is recognized that this provision is designed to become operative at death and is therefore to be construed as an agreement both to make a testamentary disposition of property, and as a testamentary disposition as such. In the latter respect it requires due witnessing and attestation as required by the statute governing the execution of wills. Mr. Ralph Ellis accordingly makes this disposition of his library to take effect

at his death, as a codicil to his will, and revoking any and all former testamentary dispositions of such library.

"IN WITNESS WHEREOF, on this third day of May, 1945, the Board of Regents of the State of Kansas has caused this agreement to be signed by its Chairman and Secretary and Chancellor Deane W. Malott, and its seal to be affixed hereto, and Mr. Ralph Ellis has signed said contract.

"THE BOARD OF REGENTS OF THE
STATE OF KANSAS, by
O. S. STAUFFER
Chairman
HUBERT BRIGHTON
Secretary
DEANE W. MALOTT
Chancellor, University of Kansas

"RALPH ELLIS
Mr. Ralph Ellis
"Personally appeared before me this third day of May, 1945, Ralph Ellis, Deane W. Malott, Oscar S. Stauffer, and Hubert Brighton who signed said instrument and acknowledge the same.

KARL KLOOZ
Notary Public
My Com. expires Aug. 1, 1946.

"Mr. Ralph Ellis further states that his signature is also made to effect the bequest of the library and that he hereby publishes, and declares that the clause bequeathing the library in question to the University of Kansas and the Board of Regents of the State of Kansas in the event of his death constitutes a testamentary disposition of his library of Natural History superseding any and all other testamentary dispositions of the same heretofore made by him. Said declaration, publication and signing is made in the presence of *F. J. Moreau, Raymond Nichols, E. R. Hall*, who, at his request, in his presence, and in the presence of each other, have hereunto subscribed their names as attesting witnesses.

"F. J. MOREAU,
RAYMOND NICHOLS,
E. R. HALL

"Dated this third day of May, 1945."

The "Agreement" giving rise to the contentions that the widow consented, or did not, to the first agreement is as follows:

"This Agreement made this third day of May, 1945, between the University of Kansas, acting by its Board of Regents and Chancellor and Mrs. Ralph (Irene) Ellis, WITNESSETH as follows:

"WHEREAS, Mr. Ralph Ellis, husband of Mrs. Ralph (Irene) Ellis is the owner of a library of natural history consisting of a reasonably large collection of books on that subject, and

"WHEREAS, Mr. Ralph Ellis proposes to house and deposit said library with the University of Kansas, located at Lawrence, Kansas, and

"WHEREAS, the said contract provided that in the event of the death of Mr. Ralph Ellis during the time when said library is housed by the University of Kansas, the said library is to pass to the Board of Regents of the State of Kansas and the said University of Kansas absolutely, and

"WHEREAS, said contract is to operate as a testamentary disposition by Mr. Ralph Ellis of said library to take effect at the death of Mr. Ralph Ellis, and

. "WHEREAS, Mrs. Ralph (Irene) Ellis was present when the terms of that proposed contract and testamentary disposition were agreed upon, and that Mrs. Ralph (Irene) Ellis is entirely familiar with all the terms of said contract, a copy of which is hereto attached, and made a part hereof.

"Now THEREFORE it is agreed that in consideration of the above premises and of the undertakings made by the University of Kansas and the Board of Regents of the State of Kansas with reference to the housing of said library pursuant to the terms of the contract above referred to, Mrs. Ralph (Irene) Ellis hereby agrees that she joins with her husband, Mr. Ralph Ellis, in the making of said contract, appoints him as her agent to dispose of any interest that she may have in said library, and approves the testamentary disposition of said library in the event of the death of Mr. Ralph Ellis during such time or times as said library is on deposit with the University of Kansas. Further, Mrs. Ralph (Irene) Ellis agrees that in the event of the passing of said library to the University of Kansas pursuant to the terms of said contract and testamentary disposition by her husband, Mr. Ralph Ellis, she will make no claim therefor and that she hereby expressly waives any and all rights which she may have had to said library under the laws of any state which may be deemed applicable.

"IN WITNESS WHEREOF the parties hereto have affixed their signatures and acknowledged the same.

> "THE UNIVERSITY OF KANSAS, by the
> BOARD OF REGENTS OF THE STATE
> OF KANSAS AND THE CHANCELLOR
> OF THE UNIVERSITY.
> > By O. S. STAUFFER,
> > > Chairman
> > By HUBERT BRIGHTON,
> > > Secretary
> > By DEANE W. MALOTT, *Chancellor.*
> > > *Mrs. Ralph (Irene) Ellis*
> > > Mrs. Ralph (Irene) Ellis

"F. J. MOREAU
RAYMOND NICHOLS
E. R. HALL
> Witnesses

"Personally appeared before me the above Oscar S. Stauffer, Hubert Brighton, Deane W. Malott and Mrs. Ralph (Irene) Ellis, personally known to . me, and who signed and executed the above writing in my presence and acknowledge the same.               "KARL KLOOZ,
                                                          Notary Public.

"My commission expires August 1, 1946."

I

We shall first take up the respondent's contention that the trial court erred in finding that Ralph Ellis was possessed of mental capacity to make the above "Agreement and Testamentary Disposi‐ tion." Inasmuch as other contentions later considered require some statement, in reviewing the evidence and the findings of the trial court thereon we shall not limit our statement to matters dealing with Ellis's competency. However, we shall not dwell on details. The evidence disclosed that Ralph Ellis was born in 1905, was the son of wealthy parents, and that his father had been dead for some years. For years Ellis had been interested in the study of ornithol‐ ogy and had collected a large and valuable library dealing with the subject, its purchase being made largely with funds given him by his mother. He kept this library in California until he brought it to Kansas. Ellis suffered from two diseases, one affecting his white blood corpuscles, the other causing him to have an inordinate de‐ sire for liquids, which he satisfied not only by water but to a con‐ siderably extent by beer and to a lesser extent with stronger liquors. In 1940 Ellis's mother filed a complaint in the proper court in Cali‐ fornia, seeking to have him committed as a mentally ill person, charging that he had threatened to commit suicide, had set fire to his garage and had threatened to set other fires and that he had on numerous occasions thrown bottles through windows of business establishments. As a result he was adjudged mentaly ill but the judgment expressly found he was not an insane person. He was committed to a sanitarium where his restraint was gradually lessened and ultimately he came and left at his pleasure. In the early part of 1943 he met and later in the same year married the respondent. His condition improved for some time thereafter but in 1944 he committed acts of destruction which caused him to be rearrested and returned to the sanitarium. About a week after that return he escaped, and with his wife went to Nevada and then on to New York where he negotiated with two New York institutions for deposit of his library under conditions somewhat similar to those included in the agreement quoted, or to sell it through persons engaged in the sale of libraries. In 1924 Ellis became acquainted with Professor Raymond H. Hall, then a member of the faculty of the University of California at Berkeley. In 1944 Hall became chairman of the department of zoölogy and director of the museum of natural his‐ tory at the University of Kansas, and when he came to Kansas he

brought with him a mammal collection belonging to Ellis. Ellis had been in communication with Hall about plans to dispose of his library and in October, 1944, Hall suggested that the library be placed in Kansas University. Chancellor Malott of Kansas University was in New York early in 1945 and Hall suggested a meeting between Ellis and Malott and they met for a short period of time and a short discussion was had in which Malott told Ellis the university would be interested in having the library. About this time Ellis sent his wife to California to box the library and ship it to New York. She did so but before the shipment reached there Ellis had it diverted to Lawrence, where the books were received and taken to the university about March 6, 1945. About the same time Ellis and his wife came to Lawrence and conversations were had, principally with Hall who suggested that Ellis procure any attorney, or perhaps C. C. Stewart an attorney of Lawrence, or Dean Moreau of the Law School. Ellis elected to have Moreau act for him. Sometime in March conversations were had about the various matters to be incorporated in the agreement and in the presence of Ellis and his wife, various provisions were talked over and finally dictated to a stenographer, who later gave Moreau a copy and from that Moreau prepared the documents later executed. The meeting of May 3, 1945, was arranged but Mrs. Ellis was not advised. However, she had short notice of that meeting and was in attendance. Others present were Malott, Hall, Ellis and Klooz. The contract was read over paragraph by paragraph and Ellis expressed satisfaction. He was told he could consult an attorney, but answered that the agreement was what he wanted, that he did not need to submit it to anyone and that he was ready to sign. During all of that time Mrs. Ellis sat by her husband and expressed no dissatisfaction with any part of the arrangement. The necessity of a contract on her part being provided in her husband's agreement, the contract to be signed by her was likewise read. There is no dispute that at that meeting each of the contracts was executed by Ralph Ellis and his wife at the places noted, and that their signatures were witnessed as shown. Later Ellis showed this contract to his attorney in New York and expressed satisfaction with it. That attorney told Ellis he was not familiar with the laws of Kansas and could give him no advice on the testamentary features of the contract. Respondent's testimony did not dispute the circumstances under which the two contracts were executed. Insofar as Mrs. Ellis was concerned, the principal point made was that at

the time she signed her contract and consent, no person had or did then advise her as to her rights under the statutes of Kansas as an heir of her husband if she did not consent to the terms of the will. Insofar as Ellis was concerned there was much testimony that on occasions he was either drunk or otherwise irresponsible, at which times he would throw bottles through windows, destroy property or be otherwise guilty of unseemly conduct, and witnesses who could qualify therefor, testified that in their opinion he was of unsound mind or lacked testamentary capacity. On the other hand, many witnesses for the proponent testified that Ellis, while peculiar in some respects, knew what an asset he had in his library and knew what he wanted to do with it; that generally he knew what he wanted and was quite persistent in getting it and that he was competent. The respondent produced some proof that Ellis was the beneficiary of a trust, which he believed was of much greater value than it actually was worth, and that he believed another trust existed when it did not. Ellis was also shown to have had securities of the value of about $20,000 from which he received a return of about $50 per month. In addition to this he received a monthly allowance from his mother of about $850 per month. This was cut off when Ellis fled from California but was later reinstated in the fall of 1945. Other evidence will be mentioned later when necessary.

Insofar as mental competency is concerned, respondent directs our attention to the rule that for one to be competent to make a will it is necessary for him to be able to understand what his property consists of, who are his relatives and friends and who are the natural objects of his bounty and also that he know what he wants to do with his property, citing *Stayton v. Stayton,* 148 Kan. 172, 81 P. 2d 1, and other of our cases to like effect. That the test is properly stated need not be debated. Respondent then devotes many pages of her brief to a detailed analysis of the evidence from which she concludes the evidence shows mental incapacity. We think the case may not be so disposed of. The trial court reached a different conclusion from evidence which was in dispute. The very course of dealing whereby Ellis sought to find a depository for his library, including not only the University of Kansas but institutions in New York, shows that he had a keen appreciation of his ownership and the worth of the library, and the purposes for which it was collected and the uses to which it could be put. He also knew he possessed the securities which he had with him in Law-

rence, and he knew the return he received therefrom. He knew likewise that he was the beneficiary of a trust, even though he may have been mistaken as to the value of the corpus of it. Likewise he knew he was married and that his wife would be a natural object of his bounty. That the evidence disclosed that Ellis knew what he wanted to do with his library is clear. It is also to be noted that the disposition made by him was not of his entire estate, but of only a particular part, useful generally only for specific purposes. Even though there was evidence that on occasion Ellis was guilty of conduct which, to say the least, was out of the ordinary, there was evidence that on other occasions he was possessed of full capacity. The trial court had the burden of determining whether, on May 3, 1945, Ellis had capacity to make the disposition under consideration, and its conclusion, being supported as we find it was by competent evidence, must end our review of this phase of the controversy.

## II

Under two headings respondent contends that it is the duty of the trial court to make special findings on all material issues when requested by either party, and that the findings made are erroneous, sketchy and incomplete, in some instances unsupported by the evidence, and in others that the trial court failed to make findings on vital issues. Many pages of the brief are devoted to a discussion of these contentions in which detailed reference is made to particular findings. The basis for the complaint is substantially the same as was included in respondent's motion to strike or modify the trial court's findings, wherein thirty-nine amendments were proposed. This opinion would be unduly extended to take up and discuss each particular item. They have all been examined. In some instances the purpose in the district court on the motion, and in this court on the appeal, is to obtain a finding favorable to the respondent's view, in others to compel the trial court to accept as true respondent's evidence and in others to obtain findings on facts which, while perhaps relevant, are immaterial. In some minor instances the complaints, in and of themselves, may have merit but that the refusal of the court to extend its findings was prejudicial does not appear. And it seems to us this is recognized by the respondent who has not only filed a very complete abstract, but has argued the evidence in detail, and in her brief, after directing attention to our power to render final judgment (G. S. 1935, 60-3317) calls our

attention to the fact the issues were fully tried in both the probate and district courts, that the evidence is full and complete and that in her opinion there is no necessity for a new trial or further proceedings, other than that under express mandate of this court the lower court comply with our directions.

## III

Competency having been determined, we next direct attention to whether or not the instrument in question was a testamentary disposition or will, or was as the trial court seems to have found, only a contract to make a will. The question arises under the ruling of the trial court sustaining respondent's demurrer to the proponent's evidence. It seems clear from the record the ruling was made because of a claim the document was not "signed at the end thereof by the party making the same" as is required for the valid execution of a will under G. S. 1947 Supp. 59-606. In support of the trial court's ruling respondent directs our attention to our decision in *In re Estate of Bond,* 159 Kan. 249, 153 P. 2d 912, wherein it was held that under the facts of that case there was no signature. It may be conceded that the statute means what it says. Waiving any question of sufficient execution otherwise authority may be found that a will not signed at the end is an entire nullity, or that such a will is good as to all that part which precedes the signature, but we need not enter into such a discussion.

We note respondent's contention that the document which Ellis signed concluded with a witnessing clause that "Ralph Ellis has signed said contract," and that from that it is clear he did not sign the document as a will. That contention cannot be sustained. There was only one document, both contractual and testamentary and he signed all, not merely a part, of it.

A mere reading of the last paragraph preceding the witnessing clause of the "Agreement and Testamentary Disposition" shows that Ellis declared, "In the event of the death of Mr. Ralph Ellis . . . then the ownership of said books shall pass absolutely to the University . . . Mr. Ralph Ellis accordingly makes this disposition of his library to take effect at his death . . ." That the above language is testamentary need not be debated. That Ellis signed the document at a place after the above statement must be conceded. Why then was it not signed at the end? It is argued that the attestation clause is testamentary and that he did not sign at the end thereof and therefore the execution did not

meet the statutory requirement. We cannot agree. Although verbose, the attestation clause in effect says the testator declared his signature was made to, and that he declared the instrument to be, a testamentary disposition, in the presence of the witnesses who in his presence and in the presence of each other signed their names as witnesses. In substance the clause said no more than the familiar words:

"The foregoing instrument of writing was on the —— day of ———— signed by the above named testator and by him declared to be his last will and testament, in our presence; and we, at his request and in his presence and in the presence of each other, have signed our names as witnesses thereto."

In our opinion the declaration the document was a will did not make a testamentary disposition—that had been done. At most it was a publication (*In re Estate of Koellen,* 162 Kan. 395, Syl. ¶ 6, 176 P. 2d 544). The trial court erred in sustaining the demurrer on the ground the will had not been signed at the end thereof.

### IV

Respondent further contends that the testamentary disposition was invalid under G. S. 1947 Supp 59-605 (§ 41 of the probate code) where, in substance it is provided that where a will is written or prepared by the sole or principal beneficiary who, at the time of writing or preparing the same, was the confidential agent or advisor of the testator or who occupied at the time any other position of confidence or trust to the testator, the will shall not be held valid unless it shall affirmatively appear the testator read the will and had independent advice thereto, and our attention is directed to many of our decisions where the statute was under consideration. Among these is *Flintjer v. Rhem,* 120 Kan. 13, 241 Pac. 1087, where it was said that the statute applies only where the will was written or prepared by the sole or principal beneficiary and who is the confidential agent or legal adviser or who occupies some other position of confidence or trust to the testator and that when those conditions exist the will shall not be held valid unless it be shown that the testator knew or read the will and had independent advice with respect thereto. Respondent makes an involved argument that the board of regents has charge of the University with power to remove executive heads, deans, professors and other employees and that none of them are disassociated from the interests of the donee. With that as a premise she argues that although the evidence disclosed that Ellis read the will, it likewise disclosed that although

he was afforded an opportunity to obtain advice from counsel of his own choosing, he did not do so, and had no independent advice. We find it unnecessary to discuss the question in the same manner it is treated by respondent in her brief for the trial court found and the evidence disclosed that Ellis was endeavoring to make, with other institutions, a disposition of his library in manner at least similar to that finally consummated by the agreement and testamentary disposition, and that he corresponded with Hall about it; that after the matter had proceeded for sometime it was suggested that he get some attorney to represent him in the preparation of the proposed agreement, and that he choose Moreau, dean of the law school, and thereafter a general understanding and agreement was reached from which Moreau prepared the documents finally executed. That Ellis expressed his satisfaction was clearly shown. In so acting Moreau was representing Ellis, and there is no hint in the evidence he did not faithfully do so. Considerable play is made on the fact that Moreau described himself as the scrivener of the will and inferences unfavorable to Moreau and the University are drawn therefrom. Some comment is also made that a draft of the proposed agreement was submitted to the attorney general, but in view of the fact the board of regents was to be a party to the contractual features and he was their advisor, that cannot be given weight as showing that the university caused the testamentary disposition to be written or prepared. We have carefully read the evidence as abstracted, and without repeating any of it we cannot hold as asked by the respondent, that because Moreau was dean of the law school and prepared the instrument and because Hall, a professor, was considerable of a confidant of Ellis, that those facts compel any conclusion either of fact or of law that the testamentary disposition was written or prepared by the principal beneficiary who was the confidential agent or legal advisor of or occupied some other position of confidence or trust to the testator. In our opinion the findings of fact upon the matter as made by the trial court are supported by the evidence and its conclusion of law therefrom was correct. What has been said heretofore is a sufficient answer to a further contention that the findings of fact and of law show a violation of section 41 of the probate code, and that they fail to determine or find upon the material issues on the matter last under consideration.

## V

Respondent also argues that the "Agreement and Testamentary Disposition" is not a contract to make a will nor if it were such a contract, is it enforceable. Our holding the testamentary provision is good as a will, makes it unnecessary to discuss this contention.

## VI

Consideration of respondent's contention that the trial court was without power to change its decision can only be understood when certain facts are stated.

In its conclusions of fact, the trial court found facts leading to its conclusion of law that the fact respondent signed the agreement of May 3, 1945, approving the testamentary disposition made by her husband, did not conclusively deprive her of an interest in the library and it concluded further that her attitude in the action was tantamount to an election on her part to take under the law of descents and distributions of the state of Kansas, and it then concluded:

"The Court further concludes that the University of Kansas and the respondent Irene S. Ellis are each entitled to a one-half interest in the library in question, subject to the rights of creditors."

In due time the proponent filed its motion for a new trial and the respondent filed her motion for a new trial, alleging erroneous rulings and that the decision was contrary to the evidence, and her motion to strike or modify the conclusions of fact and of law, included in which was the factual situation of respondent's execution of the approval and the legal conclusion thereon. For present purposes it may be said these motions were denied on February 9, 1948. (We pause here to note that terms of court in Douglas county commence on the first Mondays of February, May and November.) On February 12, 1948, respondent served her notice of appeal to the supreme court. On April 26, 1948, each party submitted a journal entry of judgment, and the trial court at that time struck from its conclusions of law the paragraph quoted above, and thereafter respondent filed another notice of appeal covering the matter.

Respondent directs our attention to 4 C. J. S. 1089 that although jurisdiction remains in the trial court until an appeal is taken, as soon as that is done the jurisdiction of the appellate court attaches and that of the trial court ceases, and to 4 C. J. S. 1091 that unauthorized proceedings in the lower court after jurisdiction has been acquired by the appellate court are generally held to be void, as well

as to our decision in *Herthel v. Geiman,* 160 Kan. 368, 161 P. 2d 518, in which after judgment was rendered and appeal was taken, a petition for a new trial was filed setting up facts which had occurred after the original trial. This court did say that appeal having been taken our review of the judgment could not be affected by subsequent facts which formed no part of the original case.

Under the code of civil procedure (G. S. 1935, 60-3007) the district court is given the power to modify its judgments under the conditions there specified, and that it has general power and control over its judgments during the term in which they are rendered has been repeatedly held as is shown by cases cited in those later mentioned. The fact an appeal has been taken does not take away that power in a proper case. In *State v. Langmade,* 101 Kan. 814, 168 Pac. 847, it was held:

"During the term at which judgment has been rendered the district court has power to set aside an order denying a motion for a new trial, to set aside the judgment, and to grant a new trial, although an appeal has been taken to the supreme court." (Syl. ¶ 1.)

That case was followed in *State v. Bowser,* 154 Kan. 427, 118 P. 2d 1055, where it was held that:

". . . a district court does not lose jurisdiction to set aside or modify, within the term, its judgments or orders, by the mere fact that appeal therefrom has been taken to the supreme court." (Syl. ¶ 1.)

Under the rule of these cases the trial court did not err in modifying its conclusions of law. In its judgment the trial court adjudged that the "Agreement and Testamentary Disposition" was entitled to probate and that the library and property mentioned therein became the property of the proponent upon the death of Ralph Ellis "subject to the interest of the said Irene Ellis, respondent, widow." The trial court had the power to alter its judgment as heretofore set out.

### VII

Although the proponent appealed from that part of the judgment holding that Irene S. Ellis had an interest in the library and that her consent to the "Agreement and Testamentary Disposition" was invalid, it suggests the possibility the question of the widow's consent was not properly before the district court and that it had no jurisdiction. With that suggestion we do not agree. The widow put the matter of her consent in issue by her answer filed in the probate court. After appeal was taken to the district court the

proponent, by reply, alleged consent and estoppel, and the widow by a second answer, again answered that the consent was not freely and understandingly executed by her. As we view it, there is no question as to the jurisdiction of the district court to decide the matter next considered.

## VIII

There is no contention but that under G. S. 1947 Supp. 59-602, in effect at all times material, or under G. S. 1935, 22-238, which was in effect before July, 1939, neither spouse could will away from the other more than one-half of his property, subject to certain rights not presently involved, unless the other consented thereto in writing executed in the presence of two or more competent witnesses. There is no contention that the document under consideration was not executed in the manner provided, nor, for what it may be worth, that the testamentary disposition, to which consent was given, did not dispose of the entire estate of the testator in the property mentioned. The question is whether the document, admittedly signed and witnessed, constituted a valid consent.

There is little or no dispute in the evidence, a part of which has been stated heretofore and some of which is here repeated. Ellis had been making efforts to dispose of his library and Mrs. Ellis was aware thereof. She had gone to California and looked after getting the library boxed for shipment to New York. She knew that destination had been changed to Lawrence, Kan., and that the books were there when the first conversations were held early in March, 1945, and was present when the preliminary statements as to disposal of the library and her consent thereto were dictated, and she knew the terms of the proposed contract, and knew that Ellis proposed that in the event of his death within the period the library was to remain at the university, the library was to become the absolute property of the university, and by a separately dictated arrangement she agreed that in the event of the death of Ellis, she waived all claim to the library. When the final drafts had been prepared and were ready for execution on May 3, 1945, she was present and the documents were read, paragraph by paragraph, and after her husband had executed his "Agreement and Testamentary Disposition" to which she raised no objection, she then executed the contract prepared for her in which she expressed familiarity with the contract executed by her husband and joined with him in making the disposition of the library, in which she

approved the testamentary disposition made by him, and in which she stated that in the event the library passed to the university pursuant to the testamentary disposition she would make no claim to it and that she expressly waived any and all rights she might have under the laws of any state. Mrs. Ellis seeks to avoid the acts deliberately done by saying, after the death of her husband, that no one advised her of her rights under the laws of Kansas pertaining to descents and distributions.

The question is whether the document executed by Mrs. Ellis was a binding consent under the statute heretofore mentioned, which contains no specification of standards for such consent. It may be noted there is no controversy as to the manner in which it was executed, nor is there any claim of oppression or fraud, and those things, present in some cases, need no consideration here. It will be observed that the document at no place contains the word "consent" but does contain the words "approve" and "waive." Under our decisions, however, it is not important what precise word or words be used—the ultimate matter for determination is whether the content of the written document indicates an acceptance of the terms of the will and a willingness that the testator make the disposition set out in his will. See *Jack v. Hooker*, 71 Kan. 652, 81 Pac. 203; *Weisner v. Weisner*, 89 Kan. 352, 355, 131 Pac. 608; and *Moore v. Samuelson*, 107 Kan. 744, 748, 193 Pac. 369.

The question of sufficiency of consent by one spouse to the will of the other has been treated in many of our decisions dealing with diverse facts and circumstances, but we deem it unnecessary to take up and analyze each of those decisions. Among them are *Jack v. Hooker*, supra; *Weisner v. Weisner*, supra; *Chilson v. Rogers*, 91 Kan. 426, 137 Pac. 936; *White v. White*, 103 Kan. 816, 176 Pac. 644; *Moore v. Samuelson*, supra; *Menke v. Duwe*, 117 Kan. 207, 230 Pac. 1065; *Williams v. Sechler*, 127 Kan. 314, 273 Pac. 447; *Woodworth v. Gideon*, 136 Kan. 116, 12 P. 2d 722; and cases cited therein. The rule deduced from all of the decisions is that the consent must be given freely and understandingly. It follows as a matter of course that whether that consent was freely and understandingly given is to be determined as of the time the document evidencing consent was executed. For instance, in *Pirtle v. Pirtle*, 84 Kan. 782, 115 Pac. 543, it was held that a wife could not repudiate her consent because she subsequently discovered that her husband's estate was larger than she anticipated. In *Weisner v. Weisner*,

supra, it was held that in case of a written consent by a wife that her husband dispose of more than one-half of his estate to parties other than her, it was only essential that she act freely and understandingly. In *White v. White*, supra, it was noted that the wife knew exactly of what her husband's possessions consisted, and that the question whether the amount she was to receive under the agreement there in question was fair and equitable could only be determined by considering the situation of the parties at the time the agreement was made, their age, the property possessed by each, and other circumstances there mentioned. In *Menke v. Duwe*, supra, it was said the wife ought to have sufficient information respecting her rights and the manner in which the will would affect those rights to enable her to act intelligently *"unless she should indicate willingness to act unintelligently."* (1. c. 213.)

It may be conceded that in many of our decisions, stress is laid on the fact that the consenting spouse was not advised as to his or her rights under the statutes pertaining to descents and distributions, but in those cases that knowledge, or lack of it, went to the question whether the consent there involved was freely and understandingly given; but it follows that if a review of the circumstances shows that the consenting spouse was fully aware of the estate of the other, and of the disposition made in the will, knew for some period of time that the particular disposition was to be made, made no effort to inform herself, made no protest to documents of testamentary disposal and her consent thereto being prepared and without making any effort to ascertain her rights, executed the consent, it must be held either that she acted intelligently or that she was willing to act unintelligently. To recapitulate very briefly, the trial court's findings, supported by evidence, show that respondent knew of her husband's efforts to dispose of the library and was willing to do whatever he might want her to do, she had charge of its being packed and shipped from California, she sat by and heard the preliminary draft made providing that if her husband died while the library was at the University, it was bequeathed to the University; that her consent would be required; that about six weeks later final drafts were ready, were read paragraph by paragraph in the presence of her husband and herself; that her husband expressed satisfaction; that she made no protest whatever, and in due time executed the instrument prepared for her, all with the formalities required by statute. The trial court's finding that respondent did not

sign the consent because of any undue pressure is clearly supported by the evidence but that she signed it without adequate knowledge of its purport and eventual effect is not a finding that she did not sign willingly and without regard to purport and eventual effect. The record shows that to be the fact.

As we view the matter the trial court's conclusion of law that the document should not be held or considered a binding consent cannot be upheld.

## IX

In its judgment the trial court taxed the costs to the estate of Ralph Ellis, deceased, and respondent complains that that action constituted an abuse of discretion, contending that she won a substantial victory in the district court and that the costs should have been taxed to the proponent. In her specifications of error this particular one is not included, and in her brief respondent cites no authority in support of her argument. Under our code of civil procedure in actions for the recovery of money only or for the recovery of specific real or personal property, costs are allowed as a matter of course to the prevailing party, but in other cases (and this is one) the court may apportion the costs as in its discretion it may think right and equitable (G. S. 1935, 60-3704, 3705, 3706). In view of the whole record, we are of opinion the judgment as to the costs may not be vacated.

## X

From what has been said, it follows that the trial court's ruling on the respondent's demurrer to the proponent's evidence is reversed, and that judgment should be entered by it, admitting the "Agreement and Testamentary Disposition" made by Ralph Ellis under date of May 3, 1945, as the last will and testament of the said Ralph Ellis; that the trial court's judgment that the library in question became the property of the proponent upon the death of Ralph Ellis, subject to the interest of Irene Ellis, respondent, widow, is reversed insofar as it adjudges that said Irene Ellis has any interest, and that judgment should be rendered by the trial court adjudging that the proponent became the absolute owner of said library, and that in all other particulars the judgment of the trial court should be affirmed, and that the cause should be remanded to the trial court for further proceedings consistent herewith. And it is so ordered.

ARN, J., not participating.

THIELE, J. (dissenting): I dissent from the last sentence of paragraph 8 of the syllabus and the corresponding portion of the opinion for as I see it this court in reaching the conclusions there stated has failed to follow established rules of appellate practice, and to follow its own decisions. While I do not believe that adherence to the doctrine of *stare decisis* is always compelled, I do believe that former decisions should be adhered to in the absence of sound reason to the contrary and that if the former decisions are wrong and are not to be followed, the reasons why they are so should be pointed out and the former decisions should be overruled.

Attention is directed to the court's opinion for the statement of facts therein concerning the execution of the testamentary disposition by Ralph Ellis and the agreement signed by his wife. In a supplementary way it is noted that the trial court found that the first meeting at which Mrs. Ellis was present was in the latter part of March or the first part of April, 1945, and at that time preliminary suggestions for both Ellis's dispostion and her consent were dictated, that when the drafts of those dictations were completed they were given to Moreau. The evidence is that no copies were given either to Mr. Ellis or his wife. It was further found that Moreau prepared the documents finally executed but neither Ellis nor his wife saw them until the morning they were executed. After they were read·on the morning of May 3, 1945, Ellis was asked by both Moreau and Malott if he did not want outside advice but Ellis stated the agreements were what he wanted. "Surprise was expressed by both Dean Moreau and Chancellor Malott to the effect that they took it for granted he would want to take independent advice." (Conclusion 16.) Ellis said he wanted to sign immediately and did so. Mrs. Ellis was present when the documents were read. The court found, "She was probably taken somewhat aback by the course pursued at the meeting as she had no notice that (the testamentary disposition) would be presented or signed on that date." She had been present when the information had first been given and knew she was expected to sign but she thought that the signing was to take place in Topeka at a later date. "She did not take counsel with anyone concerning his property or her rights therein, in case her husband died before she did. She did not sign (the agreement) because of any undue pressure brought to bear on her but she did sign it without adequate knowledge of its purport and eventual effect." (Conclusion 22.) Although

the court made no specific finding, the evidence shows clearly that Mrs. Ellis had been a resident of Kansas not to exceed six weeks at that time the agreement was signed, that she was not advised by anyone as to her rights as a surviving spouse in her husband's estate if he predeceased her and that she did not then know what her rights were. Negatively it may be said that the proponent of the testamentary disposition offered no proof that tended to show that she did have such advice or knowledge. Although denominated a conclusion of law, the trial court stated that Mrs. Ellis was not fully aware of the effect of her signing, that she had no satisfactory knowledge of what her rights in her husband's property were if he died before she did and that consequently her signed agreement should not be held or considered as a consent to the provisions of her husband's testamentary disposition, if she elected to take under the law, and that her attitude in the action was tantamount to an election to take under the law.

In hundreds of instances, in varying types of cases and under all sorts of circumstances, this court has held that findings of fact supported by competent evidence are conclusive on appeal. Generally, see West's Kansas Digest, Appeal and Error, paragraphs 1001 to 1024, both inclusive, and Hatcher's Kansas Digest, Appeal and Error, sections 495 to 508, both inclusive. That rule has been applied in cases involving consents to wills. (See, e. g., *Pirtle v. Pirtle*, 84 Kan. 782, 788, 115 Pac. 543; *Weisner v. Weisner*, 89 Kan. 352, 356, 131 Pac. 608; and *Menke v. Duwe*, 117 Kan. 207, 209, 230 Pac. 1065.) Assuming competency of the testimony, the findings of the trial court should be conclusive here.

The matter need not rest, however, on the question of appellate practice and procedure. In my opinion the conclusions of this court as to the binding effect of the widow's consent are at variance with our previous decisions.

In *Pirtle v. Pirtle*, 84 Kan. 782, 115 Pac. 543, the widow, believing her husband was going to die from injuries received, called an attorney who drew a will. A will was completed, to which she consented. When the will was admitted she attempted to avoid her consent on the ground she was ignorant of the law of descents and distributions, that she was mentally incapacitated, and that at no time did she knowingly or understandingly consent to her husband's willing away from her more than one-half of his property. The evidence disclosed that during the course of the preparation of

the will the husband talked with his wife concerning its provisions, and that the attorney advised her as to her rights under the statute and the effect of her consent. Other facts set forth are not noted. This court held that under the facts stated in the opinion, the widow could not repudiate her consent because she subsequently discovered the estate was larger than she anticipated, and it held that by a course of conduct deliberately and intelligently chosen, she elected to take under the will.

In *Weisner v. Weisner,* 89 Kan. 352, 131 Pac. 608, it appeared that the husband while in a hospital called an attorney with reference to a will. The will was brought to the hospital and read to the husband and wife by the attorney, the wife making no objections except as to the person named executor but after conversing with her husband she acquiesced and signed the consent, which stated that she had been duly informed of her legal rights to an interest in his property and that having read the will and being acquainted with the contents thereof she consented to the will, waiving her property rights under the statute. Mrs. Weisner brought an action to set aside her written consent. Among other things she testified that when she first declined to sign the husband wept and exhibited strong feelings which wrought upon her emotions and that an intimation was made that if she did not consent another will less advantageous to her might be made. In that case some comparison is made with the statute of elections by a widow after a will has been admitted. A review is made of some of our former decisions and it was then said:

"Nevertheless it can not be that the legislature intended that a wife, under the stress of expected widowhood and actuated by a desire to please her husband who on his deathbed expresses with tears his intense desire for her to consent to the terms of a will presented to her without previous warning or consideration, should be held bound by such consent *when it fairly appears that she did not understand its effect upon her property rights,* and acted under the strong persuasions and implied threat of her husband in his last sickness, and especially so when she moves promptly for revocation before others' interests become involved." (l. c. 356.) (Emphasis supplied.)

It was said that a cold, unimpassioned reading of the record disclosed ground for holding either way but that the trial court felt the consent was not given freely and understandingly, and its judgment was upheld.

In *Chilson v. Rogers,* 91 Kan. 426, 137 Pac. 936, both Chilson and his wife had been previously married and had children. Mrs. Chil-

son executed her will, leaving all of her property to her own children and grandchildren and her husband consented to that will. Shortly thereafter he delivered to his wife a letter undertaking to revoke the consent given. Mrs. Chilson died in October, 1912, and the husband then brought an action to set aside the will of his wife. After calling attention to the statute now relied upon and reviewing some of our authorities it was said that in the absence of statutory authority to do so, there was no more warrant for revoking a consent before than after the death of a spouse. This court, without setting out any of the evidence, held that the husband's consent was formally, freely and intelligently given after he had read the proposed will and the relinquishment of his rights and that the consent was made in strict compliance with law, with no claim that there was overpersuasion, misrepresentation or fraud in procuring it and that it could not be set aside.

In *White v. White*, 103 Kan. 816, 176 Pac. 644, may be found an involved statement of facts involving a document testamentary in character, quit claim deeds, a will executed ten years later containing a codicil subsequently executed and consent by the widow. In a partition action brought by the widow she claimed to be the owner of one-half of the property. The trial court held against her and she appealed to this court, which, in disposing of her several contentions, said:

"There is nothing in the findings nor in the evidence which, in our opinion, indicates that the contract was not made intelligently, or that any advantage was taken of Mrs. White's ignorance. She knew exactly what her husband's possessions consisted of, and the question whether the amount she was to receive by the agreement was fair and equitable can only be determined by considering the situation of the parties at the time the agreement was made— their age, the property possessed by each, the fact of the two sets of children, the intention of both that the family should continue to live on the property owned by Mr. White, and all the circumstances. We find nothing in the situation of the parties or the circumstances in the case which would justify us in setting aside the judgment of the district court on the ground that the settlement was unfair or inadequate." ·(l. c. 822.)

In *Menke v. Duwe, et al.*, 117 Kan. 230 Pac. 1065, the court had before it for consideration a document designated as a joint and mutual will. The action was by the widow to secure her rights under the law as the sole heir of her husband. She prevailed in the trial court and this court affirmed. After directing attention to *Keeler v. Lauer*, 73 Kan. 388, 85 Pac. 541, *Weisner v. Weisner*,

supra; *Chilson v. Rogers,* supra; and *Moore v. Samuelson,* 107 Kan. 744, 193 Pac. 369, the question was asked, what the district court was to do when confronted by expressions of this court, "freely and understandingly," "freely and fairly," "voluntarily and understandingly." In answering the question it said there could be no doubt that it was the policy of the law to give stability to consents to wills and that the statute requiring writing, execution and witnessing was designed to place expression of assent on a secure footing. Answering defendants' argument that if when an unambiguous writing was read to the widow, she did not hear or did not comprehend what was read to her, she should have informed herself before signing, and that aside from her claimed misconception of the nature of the instrument, the only mistake which induced her to sign it was a mistake of law and not of fact and that findings of fact based on parol evidence impeaching the instrument should not be allowed to stand, this court stated that if the writing were an ordinary contract defendants' position would be sound but *that the relinquishment is given to and for the benefit of a person who occupies a confidential relation to the other making the surrender, and if consent be given, the right of election, under strong safeguards with which the statute surrounds it, is surrendered and that therefore the instrument is not one which the defendants may produce and stand upon as conclusive evidence of a transaction which the law presumes to be fair and right and that in order that the conclusions of consent may be drawn, there must have been something more than the bare fact of assent as expressed in statutory form.* (Since the above was decided the provision of our decedent's act with respect to manner of making election has been changed.) The court stated further:

"There can be no doubt, however, that a wife, making the relinquishment involved in consent to her husband's will, ought to have sufficient information respecting her rights, and the manner in which the will will affect those rights, to enable her to act intelligently, unless she should indicate willingness to act unintelligently. Likewise, there is no doubt that, because of the confidential relationship, the husband, or those claiming through him, should not be privileged to take advantage of a relinquishment given in ignorance of the facts concerning which the wife should have been informed. So much being clear, it seems reasonable to say that, to constitute consent, assent, though in statutory form, must be given understandingly; and that being true, a woman may, after her husband's death, raise the issue of nonconsent to his will, notwithstanding existence of the statutory declaration of consent, and may sustain the issue by parol evidence, including evidence relating to the information she possessed and her own state of mind." (l. c. 213.)

In commenting on the evidence the court stated it was developed that the scrivener had told the widow it was necessary for her to sign in order to validate her husband's will and she believed what he said. The court further said:

"As indicated above, the court has not, in this instance recognized any presumption of impropriety in procuring execution of the declaration of consent, and has not cast the burden upon defendants of showing affirmatively that Mrs. Menke did have the information to which she was entitled when she signed the declaration. *The court does hold, however, that it was proper for her to allege and prove that the declaration was not signed understandingly with respect to material matters, that the proof offered to that effect was competent, and that the findings to that effect are well sustained.* (l.c. 214.)   (Emphasis supplied.)

Further reasoning of the court need not be detailed. In deciding the case this court held:

"After her husband's death a widow may raise an issue of nonconsent to his will, notwithstanding she has executed in statutory form a declaration of consent to the will, and she may sustain the issue by parol evidence, including evidence relating to the information she possessed and her own state of mind when the declaration was executed." (Syl. ¶ 1.)

In *Williams v. Sechler*, 127 Kan. 314, 273 Pac. 447, the action was by an administrator to compel a widow to abide by a written consent to a will, the question being whether her rights under the law had been explained to her at the time of the execution of the will. At the time the will was prepared the widow accompanied her husband to a lawyer's office where the will was prepared and was read to her. She was asked if she was satisfied with it and said she was and accordingly the scrivener wrote on the will, "I hereby approve and affirm this will," and she signed it in the presence of two witnesses. *At the time of signing she had not been informed nor did she know what her rights were under the law and she did not know that in the absence of consent given she might, after the death of her husband, elect to take under the law. Such were the findings of the trial court.* In discussing the case this court quoted from *State, ex rel., Minn. L. & T. Co., v. Probate Court,* 129 Minn. 442, 446, 152 N. W. 845, where, in part, it was said that where a wife has a legal right in the case of the death of her husband to some share in his property, there is cast upon the husband, in taking a consent to the making of his will, the affirmative duty of making to his wife a fair disclosure of his property and her rights, so that her consent will be an actual one, based upon an intelligent knowledge of his property and the effect of her consent,

as distinguished from one merely formal. After some other discussion, this court concluded:

*"In view of the fact that the defendant was requested by her husband to sign the will without knowledge of her legal rights and without explanation of the effect upon her rights to her husband's property if she consented, we think the court was fully justified in its findings that her consent was not understandingly given."* (l. c. 317.) (Emphasis supplied.)

In *Woodworth v. Gideon*, 136 Kan. 116, 12 P. 2d 722, it was contended that the consent of the widow to the will of her husband should be set aside on the ground of her mental incapacity, undue influence and duress and the lack of independent advice, the action being prosecuted by the guardian of the widow who had been declared incompetent. It appeared that the husband went to his attorney and explained the disposition he wished to make of his property and a will was drawn in accordance with his instructions. On the date the will was executed the husband and wife went to the office of the attorney and he read the will to them in its entirety and explained its provisions. The wife stated that she and her husband had discussed how they wanted their property disposed of and the provisions of the will were satisfactory to her, but it was further explained to her that the will did not bind her unless she consented to it and if she did not consent she could go into the probate court after the will was probated and elect to take either under the law or under the will. The judgment of the trial court holding the consent to be binding was upheld.

It is to be noted that in each of the above cases this court accepted the trial court's conclusions of fact and affirmed the judgment of the trial court, and that this court did not determine the facts itself.

Attention is also directed to *In re Estate of Garden*, 158 Kan. 554, 148 P. 2d 745. That case presented the question whether the widow was barred from her share of a deceased husband's estate because of an antenuptial agreement and whether she was estopped to claim her share because of the alleged acceptance of certain provisions of a will which the testator had made. I need not review at length evidence tending to show that the widow was induced to sign the contract through misrepresentation. After discussing that phase of the matter *this court said that a widow must be fully informed as to her rights under the law and under the will before she can be required to elect between them and that she cannot be held to have waived her widow's right upon mere inference, but only upon her*

*plain and unequivocal assent and upon full knowledge of her rights and the condition of the estate.*

Nor do I believe that inference unfavorable to the widow should be drawn, because the agreement she signed stated she "waived" her rights in the library. The verb "waive" and the noun "waiver" have often been the subject of judicial definition. While "waiver" has been defined in varying language, the definition most commonly accepted is that "waiver" is the intentional relinquishment of a known right. While it has been held the knowledge may be constructive, it must be of the facts or of the right which it is intended to waive. A general discussion will be found in 56 Am. Jur. p. 99, *et seq.,* and 67 C. J. p. 289, *et seq.* The above definition was used in *Marett v. World Fire & Marine Ins. Co.,* 160 Kan. 125, 160 P. 2d 664; *McCracken v. Wright,* 159 Kan. 615, 157 P. 2d 814; *State, ex rel., v. Hobbs,* 158 Kan. 320, 147 P. 2d 721; *Proctor Trust Co. v. Neihart,* 130 Kan. 698, 288 Pac. 574, and cases cited therein. See also cases cited under "waive" or "waiver" in Words & Phrases, West's Kansas Digest, Vol. 11, p. 576, and Hatcher's Kansas Digest. Under the testimony credited by the trial court there was no waiver by the widow.

The trial court was confronted by a situation unlike any considered in the cases reviewed. Contrary to the usual situation the beneficiary participated in the preparation of the contract for depositing the library at the university, and in the testamentary disposition of it in the event of Mr. Ellis's death, as outlined in the two instruments quoted in the court's opinion. The trial court heard the evidence, only a part of which is reflected in either the court's opinion or in this dissent, and knew that Mrs. Ellis was represented by no one; knew, if it believed her, and it did, that she was not aware of her rights in her husband's estate if he predeceased her, and that no one even pretended to advise her of such rights. It seems to me that to ignore the trial court's conclusion and to hold that Mrs. Ellis acted freely, intelligently and understandingly, or that she indicated willingness to act unintelligently, does violence to the record presented for our consideration.

Sмıтн, J., concurs in the foregoing dissent.